WALTER M. ELSWICK, Judge.
The claimants, W. W. Chapman and Mae Chapman, are, and have been since the year 1928 the owners in fee simple of a tract of land containing approximately twenty-two acres, situate in Freeman’s creek district Lewis county, West Virginia, lying on the west side of West Fork river. The West Virginia board of control is the owner of certain real estate situate in said district of said county, about one-fourth mile to the north of the Chapman property on the West Fork river, which is known as *245 the state 4-h camp, at Jackson’s Mill in said county. A portion of the 4-h camp property lying on West Fork river on the then east side thereof about one-half mile from the Chapman property was converted into an air field. This airport lay within a bend of West Fork river. It was to be used by the West Virginia university extension as a training field for students. Sometime prior to the year 3934 said board of control in an effort to straighten the channel of West Fork river and to improve its said property for an airfield and airport, by extending its runways, undertook and did change the course of said river by cutting a new channel over a different course and abandoning and filling in the original course and channel of said river. The work was done by the federal emergency relief administration, which work was authorized and sponsored by said West Virginia board of control.
The work on the cut for the new channel was begun on the upper end of the bend in the river and the cutting and dredging continued down from the upper end of said bend to a distance of about 2000 feet from the lower end of the bend of the river. At this point in the construction of the new channel for the river they encountered a hard ledge of rock or limestone at about seven feet above what was originally intended to he the bottom of the cut where the channel enters the cut, the top of said limestone ledge being about seven feet above what had been the level of the river bottom. Due to the heavy cost of removing the limestone ledge and continuing the cut to the level of the river bottom at the intake of the cut, the board of control on December 5, 1934 determined to abandon further excavation in said channel and to allow the river to pass over the new channel as then constructed down to the limestone ledge, which work was then accordingly discontinued by the federal emergency relief administration. (Claimant s exhibit board of control certificate).
During the course of this work the original course of the river had been filled in around the bend or curve in the river, and the water of West Fork river dammed against said ledge of *246 stone at the end of the construction, and has since backed up on the Chapman property. The water level of the river for a distance of about 1627 feet along the Chapman property has been raised about eight feet or more higher than the water level of the river along these lands prior to the filling of the old channel bed of the river.
From the evidence it appears that as a consequence of this filling in of the old channel of the river and the abandonment of the excavation of the new channel contemplated at the beginning of the work, approximately .82 of an acre of the Chapman property has been inundated by the raising of the water level of the stream; that .5 or one-half acre of said land is now a ravel, wasting area that is being undermined by the water, and that other portions of said property are becoming swampy and water sogged areas due to the seepage and inflow of the river’s waters. It appears that the Chapman property is mostly all level river bottom land, and, due to its location, and adaptability to agricultural purposes was valuable agricultural land. The soil along the river was about fifteen feet deep. (Record p. 13). Due to its location in the vicinity it could also have been .partitioned and sold into lots at an advantage. (Record p. 78).
Prior to the change of the river’s original channel trees and other vegetation grew along the river bank on the Chapman property which protected the bank from erosion. (Record p. 44). Since the water was dammed and a portion of the bank inundated the trees and vegetation have died and left the Chapman lands exposed to erosion of water. The water from the dam sejeps through the deep soil causing the river’s bank to. fall in, and the seepage of the water makes the adjoining lands, “water sogged” or “swampy” (record p. 105). Due to the raise of the water level along these lands it would be impractical to drain them, since ditches or drains would necessarily be down to the water level of the river as raised. (Record pp. 6,. 8, 9 and 43). From the evidence it appears that this land along the river will by all probability continue to erode and waste *247 away (record p. 46). As this is done more land will by all probability become water sogged and swampy..
The West Virginia board of control, by the attorney general, filed a special plea to claimant’s petition alleging that a man. damus proceeding in the proper circuit court of this state would lie against the state board of control, and that for that reason this claim is excluded from the jurisdiction of the court of claims by virtue of subsection 7, section 14, chapter 20, acts of the Legislature 1941. The question therefore is, does this court have jurisdiction? If a remedy is afforded in the circuit courts this court would not have jurisdiction. But if the claimants’ property has been taken or damaged without just compensation and no remedy is afforded in any of the courts of this state, this court has jurisdiction to entertain the claim against the state board of control.
The agencies of the state are clothed with wide discretion in determining purposes for which condemnation proceedings may be invoked, and the amount of property needful and reasonably necessary for a particular project. State v. Horner, 1 S. E. 2nd 486, 121 W. Va. 75. Even where condemnation proceedings have been instituted and the proposed project determined as to its particular location, it has been held by our Supreme Court that a county court proceeding under chapter 43, section 138 of the 1923 code may in its discretion abandon the undertaking proposed in the condemnation proceedings. It had the right to consider the state of the funds at its disposal and the probable cost of the land and construction of the project. County Court v. Hall, 41 S. E. 119, 51 W. Va. 269. Chapter 54, article 2, section 14 of the code of West Virginia, Michie’s code section 5385 supersedes the portion of chapter 43, section 138 which gave to the county court the option to pay the award of such proceeding or to abandon the proposed undertaking. The said provision no longer appears under the narrow and limited title of “public highways” to be acquired by county courts as found in the 1923 code, but appears under the broad title of Eminent Domain applicable to the state or any subdivision thereof.
*248 Said chapter 54, article 2, section 14 of the code provides that the court or judge, at the request of the applicant, may make an order permitting the applicant at once to enter upon, take possession, appropriate and use the land sought to be condemned for the purpose stated in the petition. This section of the code before the amendment of acts of 1937 further provided that:
“If the applicant shall enter upon or take possession of property under the authority of this section, and shall do any work thereon and injure such land or property, it shall not be entitled, without the consent of the defendant, to abandon the proceeding for the condemnation thereof, but the same shall proceed with reasonable dispatch to a finality, and the applicant shall pay to the owner of the land the amount of compensation and damages as finally determined in such proceeding.”
The amendment by aqts of 1937 substituted for the words “the same shall proceed with reasonable dispatch to a finality” formerly appearing, and used the words “such proceedings shall proceed to final award or judgment after a reasonable time has elapsed for completion of the work upon the particular property so entered upon and taken possession of, . . .”
In the instant case the state board of control did not enter upon or take possession of any lands owned by claimants. At the time of the undertaking we can justly conclude that the board did not deem it necessary or proper to negotiate with the claimants for a release of the damages later inflicted upon their property or to file a petition for an entry upon their lands, for the reasoon that the work being done was upon the lands owned by the state, and if it had been feasible to have completed the. work undertaken, the claimants’ property would not have beenaamaged. It was such an undertaking that all parties in interest had the right to assume that the work would be completed.
The cases of Hardy v. Simpson, 118 W. Va. 440, 190 S. E. 680, 191 S. E. 47 and Riggs v. State Road Commission, 120 W. Va. 298, 197 S. E. 813, had to deal with the rights of landowners *249 whose properties had been damaged after completion of the work being done by the state road commission. The court in the majority opinion in the Hardy case, supra, referring to-the act of the Legislature (code 54-2-14) said:
“. . . this provision contemplates a proceeding to condemn, because it provides that such proceeding may not be dismissed without the consent of the landowner. A recent act of the Legislature, Senate Bill 188, 1937 session, and now effective, provides for the ascertainment of damages for property actually taken ‘after a reasonable time has elapsed for the completion of the work upon the particular property so entered upon and taken possession of.’ This act is mentioned as showing the legislative policy . . . probably a more equitable ascertainment can be made after the completion of the project for which the property is taken, and the legislative policy seems to be to delay compensation until there is a final and complete picture of the damage done, both in the actual taking and otherwise; or on the other hand, the damage done to property, where there is no actual taking, arises solely from the maintenance and use of the project (in this case a highway) after its completion.”
In the Hardy case, supra, a writ of mandamus was refused for the reason that the project involved therein had not been completed' at the time the writ was sought and the court held that the road commissioner had a reasonable discretion, after completion of the work to take the necessary steps to ascertain of the damages, if any, to which petitioners were entitled. ■ Likewise the record in the Riggs case, supra, shows that the work had been completed sometime prior to the time the petition for mandamus was filed.
Since it appears from the decisions of the courts of our state that the only remedy which has been afforded landowners by way of mandamus has been in cases where the work has been completed and after the commission or board has had a reasonable time to exercise its discretion in .taking steps to ascertain the damages, if any, it appears that the Chapmans, the claimants in this case, have never been, and are not now, afforded a remedy in the courts of this state for the damages sustained by *250 them. Furthermore, since the board of control in its discretion had not seen cause to file its petition for right of entry or assessment of damages to claimants’ property, the board could abandon the undertaking without the statute (code 54-2-14) affording the claimants a remedy in the courts of this state.
When the board of control found it impractical to continue with the cutting of the 2000 foot ledge of rock, it had the work of cutting the new channel of the river discontinued. It was not the cutting of the channel or the completion or use of the work which caused claimants’ damages, but the failure of the board of control to complete the cutting of the channel which caused the damage to claimants’ property. By leaving the ledge or rock in the new channel, the water dammed against it, and a part of claimant’s property has been inundated by the water backing up on same. This constituted a taking as well as damages to claimants’ property.
“When a public agency acting under authority of statutes uses land which it has lawfully acquired for public purposes in such a way that neighboring real estate, belonging to a private owner, is actually invaded by superinduced additions of water, earth, sand, or other material so as effectually to destroy or impair its usefulness, there is a taking within the meaning of the constitution. Applying this rule it is universally the law that the permanent flooding of private land by the erection of a dam constitutes a taking of the land so flooded. Similarly, a permanent liability to intermittent, but inevitably recurring, overflows constitutes a taking.” 18 Am. Jur. 759, see also cases therein cited.
Having concluded that the claimants have not been afforded a remedy in the courts of the state, and that this court has jurisdiction to hear and determine the merits of said claim of claimants, from all the evidence in the case, we are of the opinion that claimants are entitled to an award for the tortious and permanent injuries sustained to their property, and that the sum of six hundred dollars ($600.00) is a fair and just compensation to them, and an order will be entered recomemnding an award accordingly.